# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE:<br><br>HEATHER MARIE BURKS,<br><br>Debtor. | CASE NO. 1:18-bk-10037<br><br>CHAPTER 7<br><br>Frank W. Volk, United States District Judge |
| ALDERSON FCI, FCU,<br><br>Plaintiff,<br>v.<br><br>HEATHER MARIE BURKS<br><br>Defendant. | ADVERSARY PROCEEDING NO.<br>1:18-ap-1002<br>Lead Adversary Proceeding |
| ROBERT L. JOHNS, TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>ALDERSON FCI, FCU,<br><br>Defendant. | ADVERSARY PROCEEDING NO.<br>1:18-ap-1008<br>*Administratively Consolidated* |

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 29, 2021, the Court convened a trial on the claims asserted in Defendant Alderson FCI, FCU's ("Alderson") Complaint and Plaintiff Trustee Robert L. Johns' avoidance claim in Adversary Proceeding No. 18-1002. On June 30, 2021, Alderson and the Trustee submitted their post-trial proposed findings of fact and conclusions of law, to which each responded. [Docs. 81, 83, 86, 87]. On July 2, 2021, Defendant Debtor Heather Marie Burks submitted her proposed findings of fact and conclusions of law. [Doc. 85]. On August 10, 2021,

the Court ordered the parties to meet and confer and file a recitation of the claims they are pursuing, the relief sought as to each, and the defenses, if any, interposed in a tabular form. [Doc. 88]. The parties responded on August 20, 2021. [Doc. 90].

## I.      FINDINGS OF FACT

The following discussion represents the Court's findings of fact with respect to the claims asserted by Alderson and the Trustee. Each finding is made by a preponderance of the evidence.

### A.      *The Parties*

Alderson is a federal credit union licensed to do business in West Virginia and serves the employees of the state's three federal prisons. [Trial Trans. at 69 (hereinafter "Tr. at ___")]. Alderson is a creditor in the related bankruptcy proceeding. Carolyn Browning, Alderson's manager, testified at trial on Alderson's behalf. [Tr. at 68–106]. Alderson seeks dismissal of Ms. Burks' bankruptcy petition or, alternatively, a declaration that the debt owed to Alderson by Ms. Burks is nondischargeable. [Doc. 90 at 1–2]. Alderson also seeks dismissal of the Trustee's Complaint against it. [*Id.* at 2].

Defendant Heather Marie Burks is the Debtor in the related Chapter 7 bankruptcy proceeding. She testified at trial. [Tr. at 11–67]. Ms. Burks seeks dismissal of Alderson's Complaint. [Doc. 90 at 3]. She further seeks a discharge of the debt owed to Alderson, as well as a discharge with respect to all other debts scheduled in her bankruptcy petition. [*Id.*].

Plaintiff Robert L. Johns ("Trustee") is the Trustee in Ms. Burks' bankruptcy proceeding. The Trustee seeks avoidance of any secured claim held by Alderson in a 2016 Jeep

Trail Hawk ("the vehicle") and return of the pre-petition and post-petition payments made by Ms. Burks toward the vehicle. [Doc. 90 at 7]. The vehicle and the debt owed thereon are the foci of these consolidated proceedings.

### B.      Contemplation of Bankruptcy

On January 17, 2018, Ms. Burks met with her lawyer regarding the possibility of filing bankruptcy as a result of her divorce in October 2017. [Tr. at 22, 47]. No decisions were made regarding the distribution of marital property during the divorce proceedings inasmuch as Ms. Burks' ex-husband had independently filed for bankruptcy at approximately the same time. [Tr. at 47]. Following the divorce, Ms. Burks and her two children continued to live in the marital home located at 301 Karnes Street in Princeton ("the Princeton home"). [Tr. at 48]. Ms. Burks alone, with great difficulty, was paying the mortgage. [*Id.*]. Upon falling behind on the mortgage, she listed the Princeton home for sale. [Tr. at 49]. During this time, Ms. Burks was employed with FCI McDowell in Welch and was commuting to work from Princeton. [Tr. at 48–49]. Ms. Burks moved from the Princeton home to McDowell County and began renting a home there. [Tr. at 48].

### C.      Refinancing of Vehicle & Omissions on Loan Application

Near the end of January 2018, Ms. Burks decided to refinance her vehicle with Alderson in an effort to lower her monthly payment. The vehicle was critical inasmuch as it ensured her transportation to work. [Tr. at 25]. On February 4, 2018, Ms. Burks submitted a Loanliner Application ("loan application") to Alderson to refinance the loan she had with Ally Financial for the purchase of the vehicle. [Ex. 3]. The loan application submitted by Ms. Burks instructs the applicant to list debts owed by providing (1) the creditor name, (2) the interest rate,

3

(3) the present balance, (4) the monthly payment, and (5) the individual owing the debt. [*Id.*]. The columns on the application list spaces for certain debts, including spaces for first and second mortgages, first and second auto loans, child care, child support, two spaces for credit cards, and two spaces for "other." [*Id.*]. The application also directs the applicant to "[a]ttach additional sheet(s) if necessary." [*Id.*].

Despite these directions, the only debt listed by Ms. Burks on the loan application was the $500 rent payment on the Welch home, which she listed as "rent-to-own." [Ex. 3]. Ms. Burks admitted at trial that she knowingly omitted her other debts from the application, including the mortgage on her Princeton home. [Tr. at 20, 61]. Ms. Burks testified she failed to list these debts because she was instructed by Ms. Browning not to list them. [Tr. at 20]. Specifically, Ms. Burks testified that (1) she informed Ms. Browning that she was contemplating filing bankruptcy, and (2) Ms. Browning had thus informed her to only list the debts she intended to maintain and keep. [*Id.*]. Ms. Browning disputes these assertions. [Tr. at 69–71].

The Court finds Ms. Burks' testimony in this respect to be of diminished credibility based upon her demeanor on the witness stand. Indeed, Ms. Burks appeared to be disingenuously attempting to evoke sympathy. At times she also exhibited a selective memory and an inability to recall minor details, despite an ability to provide detailed explanations as to others. Additionally, when Ms. Burks was asked at the start of her testimony whether there was anything prohibiting her from recalling the events surrounding the loan, she answered affirmatively. [Tr. at 10]. Specifically, she stated that her recent surgery coupled with her medications had "really messed with [her] memory." [Tr. at 10].

Nonetheless, after the Court declared her competent to proceed with trial, she exhibited little difficulty in recalling detailed information regarding the events surrounding the

loan with Alderson. Moreover, the record is devoid of any evidence demonstrating Ms. Browning

had any incentive to instruct Ms. Burks not to list all her debts on the loan application. The Court

thus specifically rejects Ms. Burks' testimony that she was instructed by Ms. Browning to omit

certain debts from the loan application. Accordingly, the Court finds Ms. Burks knowingly failed

to list all the debts she legally owed on the loan application, including her mortgage obligation on

the Princeton home. [Tr. at 20, 61].

In addition to instructing the applicant to list any debts owed, the loan application

asks whether the applicant has ever filed for bankruptcy or had a property foreclosed upon in the

preceding seven years. [Ex. 3]. Ms. Burks responded "no" on the application. While Alderson

contends the response was false, the Court finds Ms. Burks' response to be a truthful statement

based upon the evidence presented at trial.

As to any previous bankruptcy, Ms. Burks testified that while she had filed for

bankruptcy many years prior, she did not answer in the affirmative on the loan application because

that bankruptcy had not been within the last seven years. [Tr. at 54]. Additionally, Ms. Burks did

not file for bankruptcy in the instant matter until April 4, 2018, approximately two months after

submitting the loan application on February 4, 2018. [Tr. at 26; Ex. 3; Ex. 4]. As to the foreclosure

of property, the Court finds no evidence supporting the proposition that Ms. Burks' Princeton

home had been foreclosed upon at the time she submitted the loan application. Ms. Burks testified

that she had fallen behind on the mortgage payment and listed the Princeton home for sale as a

result. [Tr. at 32, 49]. Notably, it was only on May 3, 2021, that the bankruptcy court ordered a

stay lift, permitting Quicken Loans to proceed with foreclosure on the Princeton home. [Tr. at 34,

54–55; Doc. 50 in 1:18-bk-10037]. Accordingly, the Court finds no false statement by Ms. Burks

on the loan application respecting any prior bankruptcy or foreclosures.

**D.**      *Alderson's Approval of the Loan*

On February 13, 2018, the loan application was approved by Alderson. [Ex. 3]. In determining whether to extend the loan to Ms. Burks, the Court finds -- based upon Ms. Browning's testimony -- that Alderson relied on the following: (1) the loan application; (2) a credit report; and (3) Ms. Burks' eight-year employment with the United States Bureau of Prisons. [Tr. at 96]. Ms. Browning testified that after she received the completed loan application, she generated a credit report through Equifax regarding Ms. Burks. [Tr. at 94]. The Court finds that the credit report revealed to Ms. Browning that Ms. Burks had been dishonest on the loan application, as the credit report revealed substantially more debts -- specifically credit card and student loan debt -- than those listed on the loan application. [Tr. at 76; Ex. 3; Ex. 6]. The credit report also listed the Quicken Loans' mortgage on the Princeton home with the balance as "$0." [Tr. at 96; Ex. 6]. The credit report further revealed to Ms. Browning that Ms. Burks had a FICO score of 501, with a consumer rank of 4%. [Tr. at 100; Ex. 6]. Ms. Browning testified that the factors listed in the credit report included (1) serious delinquency; (2) time since delinquency too recent or unknown; (3) number of accounts with delinquency; and (4) proportion of balance to credit limits as too high on bank revolving or other revolving accounts. [Tr. at 96; Ex. 6]. Ms. Browning admitted, "in hindsight," that the credit report evidenced Ms. Burks was not a good credit risk. [Tr. at 100].

Taking the information provided in the loan application, along with the omitted debts reflected in the credit report, Ms. Browning calculated Ms. Burks' debt-to-income ratio as 25%. [Tr. at 76]. The debt-to-income ratio calculation did not include Ms. Burks' outstanding mortgage obligation on the Princeton home given that it was neither listed on the loan application nor accurately reflected in the credit report. [Tr. at 78, 96]. Ms. Browning testified that had the mortgage payment been included in the calculation, the loan would have been thrown into the

6

"questionable area," sent to the board of directors for a determination and denied. [Tr. at 78].

Having no reason to discredit Ms. Browning's testimony in this respect, the Court finds that had

Ms. Burks been forthright on the loan application regarding her outstanding mortgage, the loan

would have been denied.

## E.      *Execution of the Loan & Filing of Bankruptcy*

On February 15, 2018, Ms. Burks executed a Loan and Security Agreement and

Disclosure Statement for $37,244.02. [Tr. at 43; Ex. 5]. In return, Ms. Burks agreed to give

Alderson a security interest in the vehicle. [Tr. at 40, 43; Ex. 5]. While Ms. Browning testified it

was Alderson's intention to take a lien on the vehicle, Alderson never perfected the lien with the

West Virginia Department of Motor Vehicles. [Tr. at 89–90]. On April 4, 2018, Ms. Burks

petitioned for relief under Chapter 7 of the Bankruptcy Code. [Ex. 4]. Ms. Burks made both

pre-petition and post-petition payments to Alderson on the loan. Based upon the testimony

presented at trial, the Court finds the transmission of seven full payments of $625.99 and four

partial payments. [Tr. at 90]. Ms. Burks stopped making the payments in January 2019, after

sustaining an injury that rendered her disabled and unable to return to work with the Bureau of

Prisons. [Tr. at 60, 61]. The vehicle is now in the Trustee's possession. [Tr. at 61].

## II.      CONCLUSIONS OF LAW

## A.      *Alderson's Dismissal of Bankruptcy Petition Claim*

Section 707(b)(1) of the Bankruptcy Code permits a court to dismiss a Chapter 7

case "filed by an individual debtor . . . whose debts are primarily consumer debts . . . if it finds that

the granting of relief would be an abuse" of the Bankruptcy Code. 11 U.S.C. § 707(b)(1). Prior to

the enaction of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("BAPCPA"), a showing of "substantial abuse" was required for dismissal under Section 707(b).

*See Calhoun v. U.S. Tr.*, 650 F.3d 338, 340 (4th Cir. 2011). BAPCPA, however, lowered the

standard and only requires that "abuse" be shown. *Id.* "Abuse of the Bankruptcy Code occurs under

Section 707(b) when a debtor attempts to use the Code to get a 'head start' rather than a 'fresh

start.'" *In re Lipford*, 397 B.R. 320, 326 (Bankr. M.D.N.C. 2008) (citing *In re Green*, 934 F.2d

568, 570 (4th Cir. 1991) (noting Section 707(b) allows "a bankruptcy court to deal equitably with

the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to

take unfair advantage of his creditors")).

"To aide courts in determining what constitutes abuse, section 707(b)(2) lays out

specific criteria, which, when met, create a presumption of abuse." *In re Moriarty*, 530 B.R. 637,

641 (Bankr. W.D. Va. 2015). The formula set forth in Section 707(b)(2) is referred to as the

"Means Test." When a presumption of abuse under Section 707(b)(2) does not arise, however,

Section 707(b)(3) provides two alternative means for considering whether an abuse has occurred.

*Calhoun*, 650 F.3d at 341. Indeed, "if the court finds either, (A) 'the debtor filed the petition in

bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates

abuse,' a court may dismiss the case." *Moriarty*, 530 B.R. at 641 (quoting 11 U.S.C. § 707(b)(3));

*see also Calhoun*, 650 F.3d at 341. Alderson relies on these alternative means as grounds for

dismissal.

## 1.      Bad Faith

"A 'bad faith filing' is defined as 'a bankruptcy petition that is inconsistent with

the purposes of the Bankruptcy Code.'" *In re Bozard*, 587 B.R. 656, 663 (Bankr. D.S.C. 2018)

(quoting *Black's Law Dictionary* 166 (10th ed. 2014)). "Bad faith may involve a dishonest debtor or nefarious acts, but such motivation or intent is not necessary. Bad faith exists if the filing of the bankruptcy was for a purpose not consistent with the Bankruptcy Code or policy even though the purpose may otherwise be lawful." *Id.* "In determining whether a debtor filed her petition in bad faith, courts should look to the debtor's intent and purpose at the time of commencing the bankruptcy, focusing upon the debtor's conduct." *In re Horung*, 425 B.R. 242, 249 (Bankr. M.D.N.C. 2010) (internal citations omitted). Factors unrelated to the debtor's financial situation may also be considered, "such as eve-of-bankruptcy purchases, filing incomplete or false schedules, or failure to cooperate with the bankruptcy trustee." *In re Bozard*, 587 B.R. at 663 (citing *In re Horung*, 425 B.R. at 249).

Alderson contends Ms. Burks' false statements on the loan application warrant a finding that her bankruptcy petition was filed in bad faith, and the petition is thus subject to dismissal under Section 707(b)(3)(A). The Court, however, is unpersuaded that this act alone supports a finding the Ms. Burks filed her petition in bad faith. The record is devoid of any evidence that Ms. Burks filed her petition for a purpose inconsistent with the Bankruptcy Code or with the intention "to get a head start rather than a fresh start." *In re Lipford*, 397 B.R. at 326. To the contrary, the evidence presented at trial demonstrates that Ms. Burks' debts far exceeded her ability to pay. [Tr. at 44–45; Ex. 4]. Additionally, no evidence was presented indicating Ms. Burks filed incomplete or false schedules or that she had ever been uncooperative with the Trustee.

Moreover, the fact that the loan extension and the bankruptcy filing all occurred within a relatively short period of time is of little moment considering that Ms. Burks continued to make both pre-petition and post-petition payments to Alderson on the loan. [Tr. at 90]. These payments did not cease until January 2019, when she was no longer able to make the payments as

a result of the career-ending injury she sustained in November 2018. [Tr. at 60–61]. While Ms.

Burks' actions in relation to the loan application were certainly ill-advised and troublesome, the

Court is unable to find she filed her petition in bad faith. Accordingly, the Court concludes

dismissal under Section 707(b)(3)(A) is unwarranted.

## 2.      Totality of the Circumstances

Section 707(b)(3)(B) permits dismissal upon a determination that the totality of the

circumstances of the debtor's financial situation indicates abuse. Prior to the enaction of BAPCPA,

the United States Court of Appeals for the Fourth Circuit in *In re Green* adopted a set of factors

for consideration in the "totality of the circumstances" determination of substantial abuse under

707(b). 934 F.2d at 572–73. Specifically, our Court of Appeals directed consideration of the

debtor's ability to repay her debts, as well as the following five factors:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of [her] ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the debtor's true financial condition; and

(5) Whether the petition was filed in good faith.

*Id.* The Court of Appeals observed "that the majority of cases hold that the debtor's ability to repay

is the primary factor to be considered." *Id.* (emphasis omitted).

As noted, however, BAPCPA relaxed the standard under Section 707(b) to require

a showing of "abuse" as opposed to "substantial abuse." Nonetheless, courts have concluded the

factors set forth in *In re Green* remain instructive post-BAPCPA. *See In re Hornung*, 425 B.R. at

250 (concluding *Green* remains informative in analyzing Section 707(b)(3)(B)); *In re Bozard*, 578

B.R. at 665 (holding "pre-2005 Amendment cases, such as *Green*, remain instructive in an analysis

pursuant to new § 707(b)(3)"); *In re Lipford*, 397 B.R. at 327 (determining "[p]re-BAPCPA cases,

such as *Green*, are still instructive under Section 707(b)(3)"); *In re dePellegrini*, 365 B.R. 830,

832 (Bankr. S.D. Ohio 2007) (finding pre-BAPCPA authority instructive); *In re Pfiefer*, 365 B.R.

187, 191 (Bankr. D. Mont. 2007) (concluding "[b]ecause Congress retained the phrase 'totality of

the circumstances' in BAPCPA . . . it may look to pre-BAPCPA case law to construe the meaning

of that phrase under § 707(b)(3)"); *In re Sonntag*, No. 10-1749, 2012 WL 1065482, at *3 (Bankr.

N.D. W. Va. Mar. 28, 2012) (same). Our Court of Appeals has yet to definitively address the issue.

*See Calhoun*, 650 F.3d at 342 (finding no error in the district courts finding of abuse in considering

the *Green* factors but noting it "need not make a determination as to the enduring applicability of

the holding in *Green*").

  As noted, the plain language of the statute requires the Court to consider whether

"the totality of the circumstances . . . of the debtor's *financial situation* demonstrates abuse." 11

U.S.C. § 707(b)(3)(B) (emphasis added). In viewing the evidence presented at trial, the Court

concludes -- for many of the same reasons set forth in the bad faith analysis above -- the totality

of the circumstances of Ms. Burks' financial situation does not indicate abuse. Ms. Burks filed for

bankruptcy following an unfortunate divorce, leaving her in a situation where she was unable to

financially meet her obligations. [Tr. at 45]. Her bankruptcy petition and schedules reflect this

predicament, as Ms. Burks' debts far exceed her ability to pay. [Tr. at 44–45; Ex. 4]. Again, while

Ms. Burks' actions in relation to the loan application indicate some dishonesty on her part, the

totality of the circumstances of her financial situation do not indicate an abuse of the Bankruptcy

Code. It is evident Ms. Burks filed for bankruptcy to obtain a fresh start.

The Court notes that Alderson references the actions and inactions of the Trustee in relation to these proceedings in support of its contention that dismissal is warranted under Section 707(b)(3)(B). The Trustee's actions or inactions in relation to these proceedings, however, have little to do with whether the totality of the circumstances of Ms. Burks' financial situation demonstrates abuse. The Court concludes dismissal under Section 707(b)(3)(B) is unwarranted.

Based upon the foregoing, permitting Ms. Burks to continue in Chapter 7 bankruptcy would not constitute an abuse of the Bankruptcy Code under either prong of Section 707(b)(3). Accordingly, the Court **ORDERS** that Alderson's Section 707(b)(3) claim is **DISMISSED**.[1]

## B.     *Alderson's Nondischargeability Claim*

Alderson alternatively seeks a nondischargeability determination under 11 U.S.C. § 523(a)(2)(B).[2] A presumption exists that all debts owed by the debtor are dischargeable unless the party contending otherwise proves nondischargeability. 11 U.S.C. § 727(b). The purpose of this "fresh start" is to protect "honest but unfortunate" debtors. *Bosiger v.*

---

[1] In addition to seeking dismissal of Ms. Burks' petition, it appears Alderson also seeks dismissal of the Trustee's Complaint pursuant to 11 U.S.C. § 704. [Doc. 90 at 3]. This separate request for dismissal should have been by complaint or motion. Moreover, Alderson relies upon Section 704 in asserting the Trustee breached his duties by failing to (1) timely recover possession of the vehicle, and (2) investigate Alderson's allegations of fraud against Ms. Burks. While Section 704 sets forth the duties of a bankruptcy trustee, it does not provide for the relief requested by Alderson, specifically dismissal of the Trustee's Complaint. Accordingly, the Court **DENIES** Alderson's request to dismiss the Trustee's Complaint on these grounds.

[2] The Court notes that Aldersons' Complaint [Doc. 1] and Proposed Findings of Fact and Conclusions of Law [Doc. 81] also cite 11 U.S.C. § 727 as grounds for a nondischargeability determination. On August 10, 2021, for clarification purposes, the Court ordered the parties to submit a chart containing, *inter alia*, a recitation of the claims they intended to pursue. [Doc. 88]. Inasmuch as Alderson's claims chart did not include the Section 727 claim, the Court deems it waived. [*See* Doc. 90 at 1–3].

*U.S. Airways, Inc.*, 510 F.3d 442, 448 (4th Cir. 2007). Courts should narrowly construe exceptions

to discharge against the creditor and in favor of the debtor. *In re Strack*, 524 F.3d 493, 497 (4th

Cir. 2008) (quoting *In re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999)). The burden is on the creditor

to prove the exception to discharge by a preponderance of the evidence. *Grogan v. Garner*, 498

U.S. 279, 287–88 (1991); *In re Strack*, 524 F.3d at 497.

Section 523(a)(2)(B) exempts from discharge debts incurred through the

refinancing of credit obtained by "(1) use of a statement in writing, (2) that was materially false,

(3) respecting the debtor's financial condition, (4) on which the creditor reasonably relied, and (5)

that the debtor caused to be made or published with intent to deceive." *In re Goodwich*, 517 B.R.

572, 590 (Bankr. D. Md. 2014) (internal quotations and citations omitted).

### 1.      Materially False Statement

"A written statement is materially false if it paints a substantially untruthful picture

of a financial condition by misrepresenting information of the type which would normally affect

the decision to grant credit." *In re Pusateri*, 432 B.R. 181, 201 (Bankr. W.D.N.C. 2010) (citing *In

re Bailey*, 145 B.R. 919, 930 (Bankr. N.D. Ill. 1992)); *see also In re Candland,* 90 F.3d 1466, 1470

(9th Cir. 1996) (stating that material misrepresentations, for purposes of Section 523(a)(2)(B), are

defined as "substantial inaccuracies of the type which would generally affect a lender's or

guarantor's decision").

As previously noted, the only debt listed on Ms. Burks' written loan application is

the $500 rent payment on the residence in Welch; this paints a substantially minimized, and

untruthful, picture of her financial condition. [Ex. 3 at 2]. The loan application explicitly directed

the applicant to list any debts owed. Nonetheless, Ms. Burks concedes she failed to list on the loan

13

application the mortgage on the Princeton home; her credit report also revealed numerous other debts omitted from that same application. [Tr. at 20; Ex. 6]. As noted, the Court has discounted Ms. Burks' testimony that she omitted the mortgage obligation in obedience to Ms. Browning's directions. [Tr. at 20].

The relevant inquiry is thus the materiality of the missing mortgage obligation. Alderson knew much of the adverse credit information in advance of extending the loan. Alderson used not only the information on the loan application, but also the omitted debts revealed in the credit report. [Tr. at 76]. The credit report noted the Quicken Loans mortgage on the Princeton home, but incorrectly reported the balance as "$0." [Tr. at 77]. The mortgage was thus not added into the debt-to-income calculation, which produced a ratio of 25%. [Tr. at 72]. Ms. Browning testified that had the mortgage payment been included in the calculation, the loan would have been thrown into the "questionable area," sent to the board of directors for a determination and denied. [Tr. at 78]. It is thus evident that Ms. Burks' omission of her outstanding mortgage obligation on the Princeton home was a materially false statement under Section 523(a)(2)(B). Accordingly, the Court **FINDS** Alderson has satisfied this element by a preponderance of the evidence.

### 2.    Respecting Debtor's Financial Condition

It is axiomatic that a loan application containing questions related to the applicant's financial obligations, creditors, and employment earnings constitutes a document regarding the applicant's financial condition. The Court thus **FINDS** this element has been satisfied.

### 3.    Reasonable Reliance

A creditor's reasonable reliance on a written statement respecting the debtor's financial condition "is a factual determination to be made in light of the totality of the

14

circumstances." *In re Sapp*, 364 B.R. 618, 628 (Bankr. N.D. W. Va. 2007) (quoting *In re Ledford*, 970 F.2d 1556, 1560 (6th Cir. 1992)). "In addition to showing actual reliance upon a false statement, a creditor seeking relief under § 523(a)(2)(B) also must show that such reliance was reasonable." *In re Boyd*, 525 B.R. 299, 306 (Bankr. M.D.N.C. 2015). Additionally, "a court must objectively assess the circumstances to determine whether the creditor exercised 'that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.'" *In re Sharp*, 340 F. App'x at 908 (quoting *In re Cohn*, 54 F.3d 1108, 1117 (3d Cir. 1995) (assessing factors such as creditor's standard practices in evaluating creditworthiness, industry standards for evaluating credit-worthiness, and circumstances surrounding debtor's credit application)).

"Reasonable reliance is [thus] a more demanding standard than the 'justifiable' reliance that is required where nondischargeability is predicated on fraud, false representations, or false pretenses under § 523(a)(2)(A)." *In re Brevard*, 200 B.R. 836, 845 (Bankr. E.D. Va. 1996) (citing *Field v. Mans*, 516 U.S. 59 (1995)). "Congress required the higher level of reliance where nondischargeability is based on a false financial statement primarily because of the 'peculiar potential of financial statements to be misused . . . by creditors who know this bankruptcy law' and who 'sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge.'" *Id.* (quoting *Field*, 516 U.S. at 76–77). As such, "courts have not permitted creditors to claim reliance on a financial statement where the statement was erroneous on its face." *Id.* (collecting cases).

While there is no definitive test for determining reasonableness, factors to consider include whether (1) "prior business dealings with the debtor [existed] that gave rise to a relationship of trust," (2) "there were any 'red flags' that would have altered an ordinary prudent

lender to the possibility that the representations relied upon were not accurate," and (3) "even minimal investigation would have revealed the inaccuracy of the debtor's representations." *In re Goodwich*, 517 B.R. at 592 (internal quotations and citations omitted); *see also Sharp*, 340 F. App'x at 908. "A creditor does not reasonably rely on a false financial statement when it possesses information that shows that the statement is materially false or that raises red flags." *In re Adam*, 406 B.R. 717, 732–33 (Bankr. E.D. Va. 2009) (internal citations omitted); *see also In re Brevard*, 200 B.R. at 845 (noting circumstances in which courts have held a creditor's reliance to be unreasonable including, *inter alia*, "where the creditor's investigation of the statement suggests its falsity or incompleteness" (emphasis omitted)).

As noted in the Court's factual findings, the loan application was not the only document relied upon by Alderson in its decision to extend the loan. [Tr. at 76] Alderson also requested and received a credit report through Equifax. [*Id.*]. The credit report reflected numerous debts Ms. Burks failed to list on the loan application, thus raising a "red flag" as to the accuracy of the application. [*Id.*]. Simply put, Alderson possessed information indicating that the loan application was inaccurate and incomplete on its face. On notice of the inconsistencies between the debts listed on the loan application and those provided in the credit report, "the objectively reasonable response of someone intending to rely on the accuracy" of the loan application "would have been, at the least, to inquire of the debtor[] (1) why the additional debts reflected on the credit report were not listed on the . . . application and (2) whether there were possibly other debts not listed." *In re Brevard*, 200 B.R. at 846. Regardless of Ms. Browning's testimony that it is not unusual for applicants to omit student loan and credit card debt from the application, the Court concludes the objectively reasonable response would have been to make further inquiry of Ms. Burks once on notice of the glaring omissions.

There is no evidence Alderson made such inquiry, despite the fact the inconsistencies between the loan application and credit report were apparent. Indeed, the debts omitted from the loan application far exceeded the single, $500 rental payment that was listed. [Ex. 6]. The omission of these debts would logically suggest that Ms. Burks had been less than forthcoming about her financial situation. The Court thus concludes Alderson's failure to inquire with Ms. Burks regarding the apparent discrepancies was not objectively reasonable if Alderson intended to rely on the loan application as a basis for extending the loan. Accordingly, the Court **FINDS** Alderson has failed to prove by a preponderance of the evidence that its reliance on loan application was objectively reasonable under the circumstances.

### 4.      Intent to Deceive

In determining whether a debtor possessed an intent to deceive, "[c]ourts generally look to the 'totality of the circumstances surrounding the debtor's acts, including the debtor's knowledge of or reckless disregard for the accuracy of his financial statements." *In re Adam*, 406 B.R. at 721 (quoting *In re Dalton*, 205 F.3d 1332 (4th Cir. 2000)). Inasmuch as "it is very difficult to obtain proof of a debtor's state of mind, a creditor may present evidence of the surrounding circumstances from which such intent may be inferred." *In re Boyd*, 525 B.R at 307. Thus, "once a statement is shown to be false, a trier of fact will usually be justified -- in the absence of some evidence showing an innocent reason for the omissions or misstatements -- in concluding that they were made with the intent to deceive." *In re Brevard*, 200 B.R. at 846.

Again, it is evident from the record that Ms. Burks knew she had an outstanding mortgage obligation on the Princeton home and failed to list the same on the loan application. [Tr. at 20, 61]. As previously noted, this omission constituted a materially false statement. Inasmuch

as the Court has already rejected Ms. Burks' testimony that she omitted the mortgage obligation from the loan application because she was instructed by Ms. Browning to do so, the Court concludes she acted with the intent to deceive by knowingly failing to report the mortgage on the loan application. *In re Owens*, 549 B.R. 337, 350 (Bankr. D. Md. 2016) (noting "intent to deceive means that the statement was either knowingly false or made so recklessly as to warrant a finding that the debtor acted fraudulently").

Nonetheless, inasmuch as Alderson has failed to satisfy the reasonable reliance element under Section 523(a)(2)(B), the debt cannot be deemed nondischargeable. Accordingly, the Court **ORDERS** that Alderson's nondischargeability claim is **DISMISSED**.[3]

## C.    *The Trustee's Avoidable Preference Claim*

The trustee's avoidance power under 11 U.S.C. § 547 serves two primary purposes. First, it "promotes the prime bankruptcy policy of equality of distribution among creditors by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate." *In re Barefoot*, 952 F.2d 795, 797–98 (4th Cir. 1991) (internal quotations and citations omitted). "Second, the avoidance power discourages creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor[,] . . . offer[ing] a concurrent opportunity for the debtor to work out its financial difficulties in an atmosphere conducive to cooperation." *Id.*

---

[3] The Court notes that Alderson's Complaint also cites to 11 U.S.C. § 523(a)(4) as grounds for nondischargeability. [Doc. 1]. Alderson, however, never cited the same in its Proposed Findings of Fact and Conclusions of Law or in its submitted claims chart. The Court thus deems this claim waived.

Section 547(b) sets forth "six elements that must be proven in order for a transfer

to be set aside as preferential." *In re Railworks Corp.*, 760 F.3d 398, 402 (4th Cir. 2014) (internal

quotations and citations omitted). The transfer must have been:

> (1) of an interest of the debtor in property;
>
> (2) to or for the benefit of a creditor;
>
> (3) for or on account of an antecedent debt owed by the debtor before the transfer
> was made;
>
> (4) made while the debtor was insolvent;
>
> (5) made on or within ninety days of the filing of the bankruptcy petition; and
>
> (6) [the transfer] enable[d] the creditor to receive a greater percentage of its claim
> than it would under the normal distributive provisions in a liquidation case under
> the Bankruptcy Code.

*Id.* (citing *Morrison*, 952 F.2d at 798). A debtor is presumed insolvent on and during the ninety

days prior to the filing of the bankruptcy petition. 11. U.S.C. § 547(f). The burden rests with the

trustee to prove the transfer is avoidable. *See In re ESA Env't Specialists, Inc.*, 709 F.3d 388, 394

(4th Cir. 2013) (citing 11 U.S.C. § 547(g)). Alderson has raised no defense to the Trustee's

avoidance claim under Section 547(c). [*See* Doc. 90].

The Court concludes the transfer of Ms. Burks' interest in the vehicle to Alderson

is an avoidable preference under Section 547(b). As to the first three elements, the record

establishes that Ms. Burks transferred a security interest in the vehicle to the benefit of Alderson

on account of the $37,244.04 antecedent debt loaned by Alderson to Ms. Burks on February 15,

2018. [Tr. at 43; Ex. 5]. Alderson never perfected its security interest. [Tr. at 89–90]. Respecting

the fourth and fifth elements, the Trustee's evidence presented at trial demonstrates that at the time

of the transfer on February 15, 2018, Ms. Burks was presumptively insolvent as such transfer

occurred in the ninety days preceding her bankruptcy filing on April 4, 2018. [Tr. at 48].

Additionally, Ms. Burks' bankruptcy petition and testimony further demonstrate that she was insolvent at this time. [Ex. 4; Tr. at 47–48].

As to the sixth element, the "inquiry focuses not on whether a creditor may have recovered all of the monies owed by the debtor from any source whatsoever, but instead upon whether the creditor would have received less than a 100% payout from the bankruptcy estate." *United Rentals, Inc. v. Angell*, 592 F.3d 525, 531 (4th Cir. 2010) (internal quotations and citations omitted). Inasmuch as it is apparent from the record that other unsecured creditors -- such as those listed in Ms. Burks' petition and schedules -- were in existence at the time of the transfer, such transfer enabled Alderson to receive more than it would have received had the transfer not occurred. [Tr. at 47; Ex. 4]. The Court thus concludes the transfer is avoidable under Section 547(b).

## D.     Trustee's Recovery Pursuant to Section 550

Having found for the Trustee on his substantive claim, the Court must consider the relief to which he is entitled. Section 550 of the Bankruptcy Code provides that upon avoidance of a transfer under Section 547, a trustee:

> may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from --
>
> (1) the initial transferee of such transfer or the entity for whose benefit the transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). The Court thus finds the Trustee is entitled to the pre-petition payments made on the loan by Ms. Burks to Alderson in the sum of $1,251.98. The Court further finds that the

vehicle, as property of the bankruptcy estate, is available for liquidation and administration by the Trustee to the unsecured creditors.

   The Trustee also seeks recovery of the post-petition payments made on the loan by Ms. Burks to Alderson in the sum of $3,129.95. The Trustee contends such payments constitute assets of the bankruptcy estate pursuant to Section 541(a)(6). In support, the Trustee relies on *In re Wyatt*, 440 B.R. 204 (Bankr. D.D.C. 2010). In *In re Wyatt*, the court awarded the trustee all post-petition payments received by the creditor from the debtor on the debt secured by the avoided lien. *Id.* at 224. The court noted that "[p]ost-petition payments may be recovered as proceeds of the lien if the payments were intended by the debtor to reduce the amount of debt secured by the lien (as opposed to voluntary payments that the debtor would have made to the bank regardless of the status of its lien)." *Id.* at 210. Inasmuch as the debtor in *In re Wyatt* made payments to the creditor for the sole purpose of avoiding repossession of the vehicle, the court concluded "the avoided lien (and payments prompted by that lien, as proceeds of the lien) became property of the estate pursuant to 11 U.S.C. 541(a)" and were thus recoverable by the trustee. *Id.* at 213.

   Deeming the analysis in *In re Wyatt* persuasive, the Court **FINDS** the Trustee is entitled to the post-petition payments made on account of the lien by Ms. Burks to Alderson in the sum of $3,129.95. The record is clear that Ms. Burks continued to make post-petition payments to Alderson in order to maintain possession of the vehicle and thus reduce the amount of debt secured by the lien. [Tr. at 59, 61]. Insofar as the lien has now been avoided, the post-petition payments made by Ms. Burks thereon are now property of the bankruptcy estate.

The Clerk is directed to send copies of this written opinion and order to counsel of record and to any unrepresented party.

ENTER: January 25, 2022

Frank W. Volk
United States District Judge